7

```
 1      A.    One.

 2      Q.    Interesting.  What, approximately, were the

 3   other types that have gone to litigation?

 4      A.    Property and -- property claims and property

 5   damage and bodily injury liability claims.

 6      Q.    We might come back to that, but I want to

 7   ask some questions about how you prepared for this

 8   deposition.  And to be very clear, I don't want to get

 9   into any conversations you had with either Mr. Giometti

10   or Mr. Bellamy.  That's certainly privileged.  And if I

11   did, he would jump up and down on the table, and

12   correctly.

13          So how generally did you prepare for this

14   deposition?

15      A.    I reviewed the claim file, reviewed all my

16   notes, all the correspondence in the file, and that's

17   about it.

18      Q.    Certainly.  You mentioned that you reviewed

19   the claim file and the correspondence in the file and

20   your notes.  Would all of your notes appear in the

21   claim file?

22      A.    Yes.

23      Q.    Can you approximate the total amount of time

24   that you spent preparing for this deposition?

25      A.    Maybe 20 hours, not consecutive.
```

EXHIBIT 1

8

```
 1        Q.      I hope not.  And that 20 hours of
 2   preparation is independent of the time you originally
 3   spent processing Ms. Schimek's claim?
 4        A.      That's correct.
 5        Q.      Let's talk about the accident itself.  When
 6   did it occur?
 7        A.      Like the date of the incident?
 8        Q.      Right.
 9        A.      I don't recall the exact date.
10        Q.      Okay.  Where did --
11        A.      It was in 2016.
12        Q.      Okay.  Where did the accident take place?
13        A.      It was in Woodland Park, Colorado, and
14   that's where Ms. Schimek lives or resides.
15        Q.      What is your understanding of what happened
16   in the accident itself?
17        A.      My understanding of what happened is that
18   Ms. Schimek had left a Pilates class, and she was
19   driving down a highway.  I don't recall the highway
20   number, but it's one of the main highways in Woodland
21   Park.
22                And the tortfeasor was, like -- I'm trying
23   to explain it in words because I can't really show you,
24   but was perpendicular -- like, perpendicular to her and
25   she was turning left and she did not go on the right
```

19

1      A.      It looks like it is instructions on the

2   various different medications.  These are probably

3   doctor notes that were entered in after Ms. Schimek

4   was seen.

5      Q.      Okay.  Do you know if this exhibit,

6   Exhibit 5, has lived in the claim file since the time

7   you evaluated Ms. Schimek's claim?

8      A.      Has it lived in the claim file, did I

9   receive it?

10      Q.      Yes.

11      A.      Yes.

12      Q.      Okay.  So it says on Exhibit 5, a third --

13   or maybe a quarter of the way down, Clinic Visit Date:

14   January 18th, 2016.  That's 12 days after the accident,

15   basically two weeks.

16              I'm looking now down about two-thirds, maybe

17   three quarters of the way down, Complete Problems list.

18   Problem description, ICD Code.  Let's go over these.

19   Muscle spasm, trapezius, what's that?

20      A.      Maybe -- I mean, I'm not exactly sure

21   because, again, I'm not a doctor.  But trapezius would

22   be around your shoulders, so I would assume it might be

23   a muscle spasm in the shoulder area.

24      Q.      Next one, situational anxiety.  What is

25   that?

20

1      A.     Maybe she has anxiety in certain situations

2   or occurrences.

3      Q.     Next one you might need to pronounce for me,

4   cervicalgia.  Did I come close to the pronunciation for

5   that?

6      A.     It sounded fine.

7      Q.     Okay.  Let's agree, then, that I'm at least

8   not terribly wrong.

9             What's that one?

10     A.     I do not know, but it has the word

11  "cervical" in it, so it must have to do with that.

12     Q.     What do you mean by that?

13     A.     Her cervical, maybe like her lower body

14  area.

15     Q.     Next one is acute traumatic injury of chest

16  wall.  What does that mean?

17     A.     That she had some kind of injury to her

18  chest.

19     Q.     The next one is traumatic ecchymosis --

20  Lisa is hating us right now -- of left knee.  What does

21  that mean?

22     A.     I don't know what ecchymosis is, but it was

23  something to her left knee.

24     Q.     And then the next one is --

25     A.     Right knee.

21

```
 1       Q.    Traumatic ecchymosis of knee, right, initial
 2  encounter.  The one below is phlebitis of right arm.
 3  What is phlebitis?  I don't think I want it, but I
 4  don't know what it is.
 5       A.    I don't know.
 6       Q.    The one below that is traumatic ecchymosis
 7  of right forearm.  Do you know what that one is?
 8       A.    No.
 9       Q.    Traumatic ecchymosis of right wrist.  There
10  is a lot of ecchymosis here.  Do you know what that one
11  is?
12       A.    No.
13       Q.    Traumatic ecchymosis of right female breast.
14  Don't know?
15       A.    No.
16       Q.    MVA restrained driver, motor vehicle
17  accident, I'm assuming?
18       A.    (Nodding head.)
19       Q.    And restrained means she --
20       A.    Had a seat belt on.
21       Q.    Did you review Exhibit 5 in valuing the
22  claim?
23       A.    Yes.
24       Q.    Okay.  Did you review the medications she
25  was prescribed as a result of these 10 diagnosed
```

22

1    problems from the accident?

2        A.    Yes.

3        Q.    Okay.

4            MR. SWAN:  274, Greg.

5            (Exhibit 6 was marked.)

6        Q.    (By Mr. Swan)  I will represent to you,

7    Ms. Cole, that Exhibit 6 is a series of photocopies of

8    prescriptions.  Have you seen Exhibit 6 before?

9        A.    I don't recall receiving these.

10        Q.    Okay.  If I represent to you that these

11    documents have been in a claim file, would you doubt

12    me?

13        A.    Could you show me?  I mean, I guess I just

14    want to see it.

15        Q.    If I were to tell you that the binder that

16    you have in front of you is just a printout of the

17    entire claims file and Exhibit 6 is taken directly from

18    that, would you think I'm trying to pull a fast one?

19            MR. GIOMETTI:  Object to form.

20        A.    No.

21        Q.    (By Mr. Swan)  You don't recall seeing these

22    prescriptions before?

23        A.    These specific documents?

24        Q.    Right.

25        A.    No.

23

```
 1        Q.     Okay.  Let's go over them.  The first page,
 2   that's the one that says AO (Schimek) 000274 on the
 3   bottom.  It starts with lorazepam, half-milligram
 4   tablets, and then the date is May 3rd, 2016.  So that's
 5   about four months after the accident.
 6               We talked briefly about lorazepam before.
 7   In your experience in the industry, what is lorazepam
 8   used for?
 9        A.     Pain.
10        Q.     If I were to tell you that lorazepam is used
11   actually for anxiety, would you doubt me?
12        A.     No.
13        Q.     Okay.  Quantity 30.
14               Next page, the one that says 275 on the
15   bottom, this is the same date, May 3rd, 2016.
16   Hydrocodone/acetaminophen, 5 milligrams of the former,
17   325 milligrams of the latter.  That's Vicodin, quantity
18   60.  In your experience, what is Vicodin typically
19   prescribed for?
20        A.     Pain.
21        Q.     Okay.  So four months after the accident,
22   she was still being prescribed 60 Vicodin at a time.
23   What does that tell you?
24        A.     That she was in pain.
25        Q.     Four months after the accident?
```

24

```
 1       A.     (Nodding head.)

 2       Q.     Next page, 276, this is dated, it looks to

 3    me, like April 28th, although it could be April 23rd,

 4    but regardless, it is April 20-something.  This is

 5    cyclobenzaprine, 10 milligrams.  That is the medication

 6    name for Flexeril.

 7              In your experience in the industry, do you

 8    know what Flexeril is prescribed for?

 9       A.     No.

10       Q.     If I were to tell you that Flexeril is a

11    muscle relaxant, would you doubt me?

12       A.     No.

13       Q.     All right.  Quantity of 30.

14              Next page, 277, same date, looks like either

15    the 23rd or the 28th of April, trazodone,

16    100 milligrams, quantity 60.  If I were to tell you

17    that trazodone is used for sleep and anxiety, would you

18    doubt me?

19       A.     No.

20       Q.     Next page, we're back to lorazepam, half

21    milligram tablets, 30 of them, on January 18th.  Based

22    on this prescription and your experience in the

23    industry, what does this prescription tell you?

24       A.     You told me earlier for anxiety.  As it

25    pertains -- I mean, we're talking about this claim and
```

57

1       A.      Chris Hoag.

2       Q.      Chris Hoag, okay.  Lisa is going to want a

3   spelling for that.

4       A.      H-o-a-g.

5       Q.      Was Mr. Hoag the claims manager in June of

6   2015?

7       A.      Yes.

8       Q.      Is he still the claims manager?

9       A.      Yes.

10       Q.      He is your direct supervisor?

11       A.      Yes.

12       Q.      Who is his direct supervisor?

13       A.      I believe he reports to John Charamella,

14   who is an assistant vice president of claims.

15       Q.      Do you know how many people Mr. Hoag

16   supervises?

17       A.      At present date?

18       Q.      Yeah.

19       A.      Nine.

20       Q.      Does that number remain pretty constant?

21       A.      Yes.

22       Q.      Are all nine people field claim

23   representatives?

24       A.      No.

25       Q.      What are they?

69

1    to learn an estimating system.  So I had to learn a lot

2    about construction materials, you know, even just down

3    to like property damage liability claims or bodily

4    injury liability claims.  I mean, there is a lot of

5    stuff.

6        Q.    One of the things you mentioned was that you

7    learned how -- that there were different departments in

8    the company that you could utilize for help.  What were

9    some of these departments?

10       A.    Well, we have a large department that's

11   called home office claims, but within that division is

12   like personal property examiners, commercial examiners,

13   liability examiners.  I mean, we have like an SEU

14   department.  We have a subrogation department.  We have

15   a salvage department.  Those are some of them, but

16   there is a lot of different departments within the home

17   office claims division.

18       Q.    And this is in Michigan?

19       A.    Correct.

20       Q.    Okay.  So you could call or email subject

21   matter experts in Michigan under the home office claims

22   folks?

23       A.    Mm-hmm, yes.

24       Q.    Is there a training manual?

25       A.    I mean, not like one particular training

74

1      Q.      In what sort of -- excuse me, of what sort

2   of circumstances would you do that?

3      A.      It depends on the claim.  So property claims

4   that are like over 50,000 in damages, I would report.

5      Q.      Is there -- I'm sorry.

6      A.      Claims that -- where suit has been filed,

7   those have to be reported to our legal department.

8   Again, it kind of depends on the claim.

9      Q.      So you said that a claim which suit has been

10  filed, you have to report it to legal.  You said that

11  in a property claim in which there is 50,000 in

12  dispute, you would report it.  Is there a policy that

13  requires that you report it or is that just sort of

14  your own instinct?

15     A.      There is not a specific type of policy that

16  makes me report it.

17     Q.      Okay.  I'm interested in why of your 100 to

18  125 or so claims this claim, Theresa Schimek's claim,

19  is the only non-property or liability claim.  Is that

20  just a coincidence as far as you know?

21     A.      No, it's not a coincidence.  I mean, I can

22  tell you why.

23     Q.      I would love to know why.

24     A.      Okay.  Well, my manager assigned me that

25  claim.  He wanted me to be cross-trained in having some

75

```
 1   exposure to handling auto claims.

 2        Q.   Okay.  In fact, you were assigned this claim

 3   the day after the accident, right?

 4        A.   Yeah.

 5        Q.   Before January 7th, 2016, how many motor

 6   vehicle accident claims had you handled?

 7        A.   Maybe two or three.

 8        Q.   Okay.  So Mr. Hoag said, This claim is yours

 9   because --

10        A.   He said, I want you to be cross-trained.

11   I'm going to assign a couple auto claims to you.

12        Q.   How many did he assign to you?

13        A.   I think it was like two or three.

14        Q.   Okay.  Did any of the claims that you

15   handled before January 7th, 2016, involve a fatality?

16        A.   No.

17        Q.   Have the couple that you've handled, other

18   than Ms. Schimek's since January 7, 2016, involved a

19   fatality?

20        A.   No.

21        Q.   You mentioned that you handled maybe two or

22   three motor vehicle accidents between June of 2015 and

23   when you were assigned to Ms. Schimek's file on

24   January 7th, 2016.  Of those two or three, do you

25   remember the largest -- or the larger in terms of how
```

76

1    much Owners paid, the amount?

2         A.    Do I know the amount?

3         Q.    Approximately.

4         A.    I don't know the amount.

5         Q.    Of those two or three claims that you've

6    handled between June 2015 and January 7th of 2016,

7    do you mind -- without going into any confidential

8    information about the people involved -- giving me a

9    sense of the facts of those cases.  What happened?

10        A.    One of them was a parking lot collision

11   where two cars backed up and hit each other.

12        Q.    Okay.  Fender bender sort of thing?

13        A.    Yep.

14        Q.    Okay.  How about another?

15        A.    A truck was damaged, like someone hit their

16   door, in our insured's truck while he wasn't there.

17        Q.    The truck was parked?

18        A.    Yep.

19        Q.    A couple thousand in damage.  Any injuries

20   in that one?

21        A.    No.

22        Q.    Let's go to the parking lot fender bender.

23   Was anyone hurt?

24        A.    No.

25        Q.    Between June of 2015 and January 7th of

77

1    2016, have you handled any motor vehicle accidents in

2    which anyone sustained any injuries?

3    A.    No.

4    Q.    You mentioned before that there are four

5    field claim representatives, including yourself, so

6    there are three others.  As of January 7th, 2016, did

7    any of the other three field claim representatives have

8    more experience with motor vehicle accidents than you

9    did?

10    A.    Yes.

11    Q.    Did they all?

12    A.    Yes.

13    Q.    Had any of them handled motor vehicle

14    accidents involving injuries?

15    A.    I would imagine so.

16    Q.    Do you know if any of them had handled motor

17    vehicle accident claims involving fatalities?

18    A.    I would assume yes.

19    Q.    But Mr. Hoag assigned this one to you to

20    train you?

21    A.    That is correct.

22    Q.    How frequently, during a typical day -- and

23    again, I understand the concept of a typical day is a

24    foreign one.  How frequently do you communicate with

25    the insureds whose claims files you are handling?

83

1    Q.    Would you agree that it's Owners' obligation

2    to fully and fairly and objectively investigate claims

3    whether or not a lawsuit has been filed?

4    A.    I mean, we do that on all of our claims --

5    Q.    Okay.

6    A.    -- regardless if there is a lawsuit or not.

7    Q.    And that's good to hear.  Would you agree

8    that it's Owners' obligation to do so?

9    A.    I mean, is that like -- are you trying to

10   imply that that's like a rule or a law or that's just

11   how we operate as an insurance carrier in our claims

12   department?

13   Q.    I'm not trying to imply anything.  I'm just

14   asking if you think it's an obligation for the company

15   to do so.

16   A.    I mean, it's something we do.

17   Q.    Okay.  Does Owners have tools at its

18   disposal to investigate claims?

19   A.    Yes.

20   Q.    Okay.  Might these include examinations

21   under oath?

22   A.    Sure, if that's applicable or something that

23   we want to do.

24   Q.    Okay.  Independent medical examinations?

25   A.    Are you just asking in general?

84

1     Q.    I mean, does Owners have the ability to

2    conduct an independent medical examination in valuing a

3    claim?

4     A.    Yes.

5     Q.    Does Owners have the ability to use private

6    investigators?

7     A.    Sure.

8     Q.    Okay.  What other tools does Owners have at

9    its disposal to investigate claims?

10     A.    Engineers.  I mean, there is various types

11    of engineers.  Again, it's dependent on the type of

12    claim.  Like our examiners we have in home office, our

13    legal team, my manager, my peers.

14     Q.    In valuing Ms. Schimek's claim, did you use

15    an examination under oath?

16     A.    No.

17     Q.    Did you use an independent medical

18    examination?

19     A.    No.

20     Q.    Did you use a private investigator?

21     A.    No.

22     Q.    Did you contact the folks at home office?

23     A.    No.

24     Q.    You've identified who Chris Hoag is.  Who is

25    Magnolia Pearce?

91

```
 1   all with most of the problems.  Did you research them?

 2       A.    Well, I had a general idea of what happened

 3   in the accident, and I do recall reviewing all of the

 4   documents, but -- I mean, I don't always remember

 5   exactly every single sentence that's in a report.

 6             And no, it's not always necessary to, like,

 7   Google every single word if I understand what happened

 8   in the claim.  I mean, I knew what her injuries were,

 9   but a lot of the medical terms are saying the same

10   thing.

11       Q.    Okay.  Did you -- well, did you Google any

12   of the injuries?

13       A.    I don't recall.

14       Q.    Okay.  If you did, can I assume that it

15   would be documented in the claim file?

16       A.    That I Googled something?

17       Q.    Or that you researched the injuries

18   generally?

19       A.    I don't know that I would have put that I

20   Googled it or researched it.  My notes would probably

21   reflect what the injuries were.

22       Q.    Okay.  If your notes don't have anything

23   about researching the injuries, is it fair for me to

24   assume that there was no research about the injuries?

25       A.    No.
```

96

1    indication that you reviewed the medication.  Is there?

2         A.    I was aware of some of the medications, but

3    no, I didn't look at all 10 of those pages.

4         Q.    Okay.  During your evaluation of this claim,

5    which medical experts did you speak with?

6         A.    What kind of medical experts are you talking

7    about?  Like outside one?

8         Q.    Mm-hmm, yes.

9         A.    None.

10        Q.    Did you speak with anyone inside the company

11   about any of these physical injuries?

12        A.    I guess probably Chris when we talked about

13   the file.

14        Q.    This is Mr. Hoag?

15        A.    Yes.

16        Q.    What specifically did you speak with

17   Mr. Hoag about in regard to the physical injuries?

18        A.    Just what the injuries were and there was

19   bruising.

20        Q.    And nine other diagnosed conditions --

21        A.    Okay.

22        Q.    I'm sorry.  Go ahead.

23        A.    No.

24        Q.    Is Mr. Hoag a physician?

25        A.    No.

97

1     Q.     Where in the claim file is it indicated that

2   you spoke with Mr. Hoag about the diagnosed physical

3   conditions?

4     A.     It's not.

5     Q.     Okay.  Let's move on to the psychological

6   injuries.  Did you speak with any outside psychological

7   experts?

8     A.     No.

9     Q.     Did you speak with anyone inside the company

10   about the diagnosed psychological injuries?

11     A.     Yes.

12     Q.     Who?

13     A.     Chris.

14     Q.     Where is that documented?

15     A.     It's not.  It was just a conversation.

16     Q.     Okay.  Do you know if Mr. Hoag has any

17   training in the field of psychology?

18     A.     I don't know.

19     Q.     What specifically did you discuss with

20   Mr. Hoag about the diagnosed psychological injuries?

21     A.     Just what they were.

22     Q.     Okay.  What did he tell you?

23     A.     Like in what context?

24     Q.     You said you discussed the psychological

25   injuries with Mr. Hoag.  What --

106

1     A.     Well, I know there is 17 of them, so they

2     all have -- there is 17 different requirements.   I

3     mean, we can go through them, but I don't know them all

4     off the top of my head.

5            But it is -- I mean, to be reasonable,

6     investigate, respond and communicate timely and

7     promptly.   There is a lot of them that I think we do as

8     a company to ensure that we meet those.   I don't know

9     that it's specifically some of them -- like some things

10    that I do, but it's how we operate.

11    Q.     Before lunch, you explained that prior to

12    this claim being assigned to you as a training exercise

13    on January 7th, 2016, by Mr. Hoag, you had handled a

14    parking lot fender bender and a situation where someone

15    opened a door into a truck and that the other field

16    claims reps all had more experience in motor vehicle

17    accidents, including those with injuries, including

18    those with fatalities.

19           Prior to this claim, how many uninsured

20    motorist claims had you handled?

21    A.     None.

22    Q.     This was your first?

23    A.     Yes.

24    Q.     When Mr. Hoag assigned you Ms. Schimek's

25    file as your first motor vehicle accident claim file

108

1    want to view Jon's notes.

2        Q.    (By Mr. Swan)  You said that Mr. Hoag gave

3    you this claim file as a training exercise --

4        A.    I, mean I wouldn't really call it a training

5    exercise.  It was a real life claim.  It was just to

6    cross-train me so I could be exposed to auto claims.

7        Q.    If Mr. Hoag's intention was to cross-train

8    you on this new type of claim file, how involved was

9    Mr. Hoag in training you on this claim file?

10       A.    Probably just as anyone would.  If you have

11   a question about something, I would ask him.

12       Q.    Okay.  Did he approve your valuation before

13   you submitted it to the insured?

14       A.    Well, he doesn't have to approve because I'm

15   the handling rep of the file.

16       Q.    I understand, but the question is, did he

17   approve it?

18       A.    But he doesn't need to approve anything.

19       Q.    I understand that.

20       A.    So then I guess no, if you're talking about

21   pure approval, because I have authority to handle the

22   file, evaluate it, and make settlement offers.

23       Q.    Right.  So in order to cross-train you with

24   this new type of claim file, he was available for

25   questions?

109

1      A.     That's correct.

2      Q.     I think the last question I have -- maybe

3   not -- you said that valuation is a subjective thing.

4      A.     Parts of it.

5      Q.     Why not 24,000?  Why not $33,324.12?  I want

6   to better understand your thought process.

7      A.      I felt like 22,000 was an appropriate offer

8   for the non-economics based off of what I know about

9   the file and the accident.

10     Q.     What you knew about the file and the

11  accident, would you say that you have a good

12  understanding of the file?

13     A.     Yes.

14     Q.     Would you say that you have a very good

15  understanding of the file?

16     A.     Yes.

17            MR. SWAN:  I don't have anything further.

18            MR. GIOMETTI:  I have no questions.

19            *    *    *    *    *    *    *

20            WHEREUPON, the foregoing deposition was

21  concluded at 2:01 p.m.  The total time on the record

22  was 3 hours and 16 minutes.

23

24

25